McClendon, j.
L,In this matter, the biological mother of two children appeals the trial court judgment granting an intrafamily adoption. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
K.P.D. and D.M.D. are the parents of two minor children, P.P.D. and D.W.D.[1] K.P.D. and D.M.D. divorced in 2002, and on September 4, 2002, the Family Court for East Baton Rouge Parish awarded D.M.D. the sole custody of the children, subject to supervised visitation by their mother, K.P.D. Judgment to this effect was signed on October 28, 2002. One year later, on October 28, 2003, D.M.D. married D.D.D.
On January 23, 2006, D.D.D. filed for an intrafamily adoption of the minor children. D.M.D. joined in the petition. The petition asserted that the whereabouts of K.P.D. were unknown, and on January 25, 2006, an attorney was appointed for the limited purpose of locating K.P.D. and effecting service.[2] Through her attorney, K.P.D. was served with a copy of the petition by certified mail on March 3, 2006, and also by regular mail on |sMarch 10, 2006. Thereafter, K.P.D. contacted the appointed attorney regarding the adoption proceedings.
Trial of the matter was held on June 20, 2006, with K.P.D. appearing in proper person. Written reasons for judgment were issued on July 31, 2006, finding that the adoption was in the best interest of P.P.D. and D.W.D. and granting the intrafamily *1219 adoption by D.D.D. Following the denial of KP.D.’s request for a new trial, judgment was signed on August 30, 2006. K.P.D. appealed.
In her counseled appeal, K.P.D. raises several assignments of error, including whether she had a right to appointed counsel, whether her failure to pay court-ordered child support was without just cause, and whether the adoption is in the best interests of the children.
DISCUSSION
Among the types of adoption authorized by the Louisiana Children’s Code is the intrafamily adoption, which refers to adoption by a stepparent or certain other relatives of the child. See LSA-Ch.C. arts. 1170, 1243. Articles 1243 through 1258 of the Children’s Code set forth the procedures for intrafamily adoptions.
In her first several assignments of error, K.P.D. asserts that the juvenile court erred in failing to appoint her counsel in this intrafamily adoption when the termination of her parental rights was at issue. Specifically, K.P.D. alleges that she has a constitutional right to such an appointment.
We note that Louisiana specifically provides for the appointment of counsel for an indigent parent, as well as the child, in state-instituted termination proceedings. LSA-Ch.C. art. 1016. However, no such statutory Rright exists in an intrafamily adoption proceeding! Therefore, KP.D.’s right to counsel can only arise from a constitutional basis.
In this regard, the United States Constitution does not require the appointment of counsel for an indigent parent in every parental termination proceeding. Lassiter v. Department of Soc. Serv. of Durham Cty., 452 U.S. 18, 31-32, 101 S.Ct. 2153, 2162, 68 L.Ed.2d 640 (1981). The decision of whether due process calls for the appointment of counsel for indigent parents in a termination proceeding is to be answered in the first instance by the trial court, subject to appellate review. Lassiter, 452 U.S. at 32, 101 S.Ct. at 2162.
In Lassiter, the State of North Carolina instituted proceedings to terminate a mother’s parental rights. At the hearing on the petition, the court, noting that she had been given ample opportunity to obtain counsel and that her failure to do so was without just cause, did not postpone the proceeding. The mother did not aver that she was indigent and the court did not appoint counsel for her. Thereafter, her parental rights were terminated, and she appealed, asserting that because of her indigent status, the Due Process Clause of the Fourteenth Amendment required the state to appoint counsel for her. Lassiter, 452 U.S. at 20-24, 101 S.Ct. at 2156-58. At the outset of its due process analysis, the Court acknowledged:
For all its consequence, “due process” has never been, and perhaps can never be, precisely defined.... [T]he phrase expresses, the requirement of “fundamental fairness,” a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what “fundamental fairness” consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.
Lassiter, 452 U.S. at 24-25, 101 S.Ct. at 2158.
|,r,Based on its precedents of what fundamental fairness means when considering the right to counsel, the Court determined that there is a presumption thát an indigent has a right to appointed counsel only when, if he loses, he may be deprived of *1220 his physical liberty. Lassiter, 452 U.S. at 26-27, 101 S.Ct. at 2159. The Court then noted the case of Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), which set forth three elements to be evaluated in deciding what due process requires: the private interests at stake, the government’s interest, and the risk that the procedures used will lead to erroneous decisions. These elements must be balanced against each other, and then against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom. Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159.
In summarizing the Eldridge factors in light of the right to counsel when a state seeks to terminate an indigent parent’s rights, the Court stated:
[T]he parent’s interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent’s rights insupportably high.
Lassiter, 452 U.S. at 31, 101 S.Ct. at 2161— 62.
After carefully weighing the Eldridge factors against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, the Supreme Court concluded that there was no denial of due process when the trial court did not appoint ^counsel for the indigent mother in her state-instituted termination proceedings. Lassiter, 452 U.S. at 31-33, 101 S.Ct. at 2161-63.
In this matter, K.P.D. did not ask for the appointment of counsel during these proceedings. With the filing of the petition for adoption, D.M.D. requested that counsel be appointed as curator ad hoc to locate K.P.D., after which K.P.D. was clearly made aware of the adoption proceedings. At the trial of this matter, K.P.D. said nothing about having counsel appointed to represent her in the merits of this proceeding.[3] Thus, the question whether due process called for the appointment of counsel for K.P.D., as an indigent parent, in these proceedings that resulted in the termination of her parental rights, was not presented to, and therefore could not be answered by, the trial court. See Lassiter, 452 U.S. at 32, 101 S.Ct. at 2162.
Nevertheless, even if we were to determine that KP.D.’s pauper status, coupled with her request for a continuance of the hearing on her motion for a new trial so *1221 that she could retain counsel, somehow suffices to put the question of the appointment of counsel before the juvenile court, we do not believe that the appointment of counsel was required in this instance. We recognize that a parent’s desire for and right to “the companionship, care, custody and management of his or her children” is an important interest that “undeniably warrants deference and, absent a powerful countervailing 1 ^interest, protection.” Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159-60, citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). A parent’s interest in the correctness of a decision forever altering his or her parental status is a “commanding one.” In re Rodrigue, 95-0009, p. 3 (La.App. 1 Cir. 6/23/95), 657 So.2d 648, 650, writ denied, 95-2141 (La.10/27/95), 662 So.2d 2, citing Lassiter, 452 U.S. at 27, 101 S.Ct. at 2160. However, after a careful weighing of the necessary factors, and balancing them against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of personal liberty, we do not find that the juvenile court erred in failing to appoint counsel.[4] KP.D.’s interests, although compelling, are not outweighed by the state’s interests “to promote the permanent placement of available children into suitable homes” (LSA-Ch.C. art.- 1167), and the state’s additional interest in concluding child-custody litigation in a timely manner. Additionally, the risk of an erroneous decision is not great, and there was no showing that the presence of counsel for K.P.D. would have made a determina-five difference. No expert witnesses testified, nor were there-any unusually complex evidentiary issues or points of law. Further, the primary consideration in intra-family adoptions continues to be the best interests of the child. LSA-Ch.C. art. 1255. We further note that, unlike a state-instituted proceeding, there was little or no risk of criminal liability to K.P.D. inherent in this stepparent adoption.
^Accordingly, we find that the juvenile court did not deny K.P.D. due process of law when it did not appoint counsel for her, and KP.D.’s assignments of error regarding the right to counsel are without merit.[5]
K.P.D. also disputes the . juvenile court’s finding that she did not prove just cause for failing to fulfill her court-ordered child support obligation. Generally, under LSA-Ch.C. art. 1193, the parents’ consent to the adoption is required. However, parental consent may be dispensed with in certain situations as provided by LSA-Ch.C. art. 1245:
A. The consent of the parent as required by Article 1193 may be dispensed with upon proof of the required elements of either Paragraph B or C of this Article.
[[Image here]]
C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercis *1222 ing lawful custody of the child and any one of the following conditions exists:
(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.
The initial burden of proving that a parent’s consent is not required is on the party seeking the adoption. Once a prima facie case of nonsupport is proven, the burden of proof shifts to the nonconsenting parent to show that his or her failure was due to factors beyond his or her control. In re T.A.S., 04-1612, p. 6 (La.App. 1 Cir. 10/29/04), 897 So.2d 136, 140.
On September 4, 2002, the family court ordered K.P.D. to pay to D.M.D. support payments in the amount of $100 per month per child, retroactive to May 14, 2002. It is undisputed that no payments were made until D.D.D. filed her petition for adoption, at which time a payment of $200 |awas made. In lengthy and thorough written reasons, the juvenile court stated:
[K.P.D.] did not offer any reason for not paying child support other than not having a job. The record reflects that [K.P.D.] is able to get jobs but is unable to maintain employment. [KP.DJ’s inability to maintain employment does not constitute just cause unless it is a factor beyond [KP.DJ’s control. Although [K.P.D.] has been diagnosed with ADD and Bi-Polar Disorder, [K.P.D.] fails to seek a treatment plan that would allow her to function and maintain employment. [KP.D.’s] failure to even acknowledge the fact that there is an illness that warrants treatment in the first instance is a condition that is within [K.P.D.]’s control. In other words, [K.P.D.]’s failure to seek treatment for an illness that is keeping [K.P.D.] from being gainfully employed so that she can pay child support is not a factor that is beyond her control and therefore is not just cause for nonpayment of child support.
We agree and find no error in the juvenile court’s factual findings that K.P.D. failed to comply with the court order to pay support and that such failure was without just cause for a period of at least six months. Accordingly, pursuant to LSA-Ch.C. art. 1245, KP.D.’s consent to the adoption was not necessary.
Nevertheless, even if consent of a parent is not necessary because of the failure to support his or her child, the court must still consider whether the adoption is in the best interests of the child. The basic consideration in an intrafamily adoption is the best interests of the child. LSA-Ch.C. art. 1255 A. In cases where the stepparent seeking adoption is married to the parent who has been granted sole custody of the child, there is a rebuttable presumption that the adoption is in the best interests of the child. LSA-Ch.C. art. 1255 B; In re T.A.S., 04-1612 at pp. 6-7, 897 So.2d at 140.
In looking at what factors must be considered when determining the best interests of the children in this matter, this court has recognized that the most important factors are the children’s relationships with their stepmother and their natural mother. In re J.A.B., 04-1160, pp. 8-9 (La.App. 1 Cir. 9/17/04), 884 So.2d 678, 684, writ denied, 04-2963 (La.12/14/04), 888 So.2d 848. In the J.A.B. case, the court recognized:
It is not enough to examine the love and home environment provided by the petitioner/stepparent. The court must also examine the depth of closeness of the child’s ties with the non-custodial natural parent, and the effect which the loss *1223 of this relationship would have on the child. Further, the court must consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent.
In re J.A.B., 04-1160 at p. 9, 884 So.2d at 684.
The record clearly shows erratic and delusional behavior by K.P.D. One instance of this psychotic behavior occurred in January of 2002, when K.P.D. was driving her vehicle with her children in the car and she believed she was being followed. She ended up in the parking lot of a K-Mart store, where the police were summoned. K.P.D. became suspicious and questioned whether the police were “real.” She refused to get out of the car when requested by the police and rammed the police vehicles with her own, while P.P.D. and D.W.D were in her vehicle. Worried about the safety of the children, the officials had to break a rear window to retrieve the children. After this incident, K.P.D. was admitted to Our Lady of the Lake Hospital, and D.M.D. was granted custody of P.P.D. and D.W.D.
Following the trial in this matter, the juvenile court concluded that it would be in the best interest of P.P.D. and D.W.D to terminate KP.D.’s parental rights and to grant the petition for adoption filed by D.D.D. In considering the relationship of the children with their mother, the juvenile court stated:
In the present case there is evidence of an existing relationship between [K.P.D.] and [P.P.D.] and [D.W.D], thus the effect of legally severing this relationship would be detrimental to the children. The record shows that the children know [K.P.D.] is their biological mother but only visit with her luone weekend per month due to the difficulties of scheduling the 'supervised visits with [K.P.D.]’s mother, the supervisor, whose job requires that she work on weekends. Although the supervised visits are regular, to cease those visits with the maternal grandmother and the biological mother will certainly have a detrimental effect on the children. One can only speculate the degree of the effect because absolutely no evidence was presented to show the strength of the bond between [K.P.D.] and the children. What is noteworthy is that [D.M.D.] calls and arranges the supervised visits with [K.P.D.J’s mother and has maintained this custody arrangement almost unilaterally.
With regard to KP.D.’s mental health issues, the court continued:
In this case, there is little doubt in this court’s mind that [K.P.D.] has unresolved mental health issues that she fails to acknowledge- [K.P.D.]’s current predicament is unfortunate but is most likely a disposition she could have avoided. Her refusal to acknowledge, treat and actively manage her mental condition has led her life down a difficult path where she cannot meet her own most basic needs such as securing and maintaining employment and maintaining adequate housing. At any point in time, [K.P.D.] could have sought treatment to regain control of her life and possibly modify the supervised custody arrangement with the Family Court. Instead, the evidence reveals instances of violence, anger, resentment, fear and an entire gambit of mental health issues that are cloaked under [KP.D.Js unwillingness to cooperate with her physicians *1224 and the courts. [K.P.D.] has simply not been compliant with the orders issued by the medical community and the legal community. In this same vein, [K.P.D.] has been on notice since January 2002, the date [D.M.D.] was granted ex parte custody after the K-Mart incident, that there was a problem with her fitness as a parent. This should have served as a “wake-up call” if nothing else had alarmed her up to this point. Either [K.P.D.] was not cognizant of the circumstances around her or was cognizant but indifferent; in either case[,] she did not improve her situation. The prognosis for [K.P.D.] to recover in the near future is poor and there is no reasonable expectation of significant improvement in her condition in the near future. [K.P.D.] presented no evidence that her mental state has improved;[6] indeed, she does not even acknowledge that she has a mental health problem, thus the inference is her mental state today is the same as it was in January 2002. For these reasons, the court concludes that [K.P.D.] is not parentally fit and termination of her parental rights [is] in the best interests of [P.P.D.] and [D.W.D.]
[ ^Thereafter, the juvenile court recognized that D.D.D. has been actively involved in P.P.D.’s and D.W.D’s daily lives, that the children have a strong bond with D.D.D., and that D.D.D. has brought stability to the children on a consistent basis.
As a reviewing court, we may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Dep’t of Transp. and, Dev., 617 So.2d 880, 882 (La.1993). When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact’s findings, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
We have thoroughly reviewed the record and find that a reasonable factual basis exists for the conclusion of the juvenile court that the adoption is in the minor children’s best interests. Moreover, we find no manifest error in the juvenile court’s judgment granting the adoption of P.P.D. and D.W.D by D.D.D.
CONCLUSION
Accordingly, we affirm the judgment of the juvenile court granting the adoption by D.D.D. of P.P.D. and D.W.D. Given K.P.D.’s pauper status, we decline to assess to her the costs of this appeal.
AFFIRMED.

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules-Courts of Appeal, the initials of the parties involved in this matter will be used instead of their names.

. Article 1250 A of the Louisiana Children’s Code provides:
If a parent upon whom service is required under Article 1247 cannot be served in accordance with the provisions of Article 1248 or 1249, the court shall appoint an attorney at law as curator ad hoc for the parent and service shall be made upon the curator ad hoc.
Article 1251 of the Children’s Code also provides:
A. The curator ad hoc shall make a diligent effort to locate the parent and notify him of the pendency and nature of the proceedings. Any appearances or acceptances of service by the curator ad hoc shall be valid, but he shall not be allowed to waive any rights of notice.
B. The curator ad hoc shall submit to the court a note of evidence indicating the efforts made to locate the parent and shall receive an appropriate fee.

. The only discussion in the record regarding counsel for K.P.D. was in connection with K.P.D.'s motion for a new trial after the adoption was granted. At the hearing on the motion, K.P.D. asked the court for a continuance to retain counsel. Opposing counsel objected to the request noting that a continuance had previously been granted when the original petition for adoption was filed so that K.P.D. could obtain representation, but that no counsel was ever retained. The juvenile court, noting the time delays for effective and efficient adoption proceedings, denied the second request for continuance. Further, at the hearing, the juvenile court noted that in other related legal matters, K.P.D. had been represented, at least partially, by counsel. The court also noted that it had referred K.P.D. to the Pro Bono Project of the Baton Rouge Bar Association earlier in the proceedings. K.P.D. also had used Capital Area Legal Services in the past for representation.

. This court has previously determined that the appointment of counsel was not required in an intrafamily adoption by grandparents, which resulted in the termination of the parental rights of an indigent incarcerated father. In re Rodrigue, 95-0009 at p. 3, 657 So.2d at 650.

. We also find no merit in K.P.D.’s argument that the juvenile court erred in failing to appoint counsel for the children.

. We find no error in the juvenile court s exclusion of the medical report of Dr. Robert Blanche as inadmissible hearsay. Nor did it affect the outcome of this matter.